## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **CBC RESTAURANT CORP.**, *et al.*, [1] | Case No. 23-10245 (KBO) |
| Debtors. | (Jointly Administered) |
| **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CBC RESTAURANT CORP.**, *et al.*, | |
| Plaintiff, | |
| v. | Adv. No. 23-50386 (KBO) |
| **SSCP RESTAURANT INVESTORS LLC,** | |
| Defendant. | |

## COMPLAINT AGAINST SSCP RESTAURANT INVESTORS LLC FOR REDUCTION OF ITS CLAIM, DECLARATORY RELIEF, DISALLOWANCE OF ITS CLAIM, AND EQUITABLE SUBORDINATION

The Official Committee of Unsecured Creditors (the "Committee" or the "Plaintiff") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its undersigned counsel, hereby brings this adversary proceeding by filing this complaint (the "Complaint") against SSCP Restaurant Investors LLC ("SSCP" or "Defendant"). The Committee seeks the entry of: (1) a judgment disallowing, on separate bases, a portion of SSCP's secured claim against the Debtors and SSCP's entire secured claim; (2) a declaratory judgment determining that SSCP is not the proper

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include CBC Restaurant Corp. (0801), Corner Bakery Holding Company (3981), and CBC Cardco, Inc. (1938).  The Debtors' service address is 121 Friends Lane, Ste. 301, Newtown, PA 18940.

holder of the debt that forms the basis of its secured claim; and (3) a judgment equitably subordinating SSCP's claim to holders of legitimate unsecured claims of the Debtors. In support of its claims, the Committee alleges as follows:

## PARTIES

1. Each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on February 22, 2023 (the "Petition Date"). No trustee has been appointed and each of the Debtors is a debtor in possession in the above-captioned jointly administered Chapter 11 Cases.

2. The Debtors, founded in 1991 by the Lettuce Entertain You restaurant group, operate the Corner Bakery fast-casual restaurant chain serving kitchen-crafted breakfast, lunch and dinner and providing catering to guests in markets across California, Texas, Pennsylvania, Illinois, Virginia, Maryland and the District of Columbia.

3. In April 2020, Pandya Restaurant Growth Brands, LLC, one of the Rohan Group of Companies, operated by the real estate investor and restaurant operator Jignesh (Jay) Pandya of Bucks County, Pennsylvania, purchased the Corner Bakery entities from then-owner Roark Capital Group.

4. The Committee was appointed on March 20, 2023 as an official committee to represent the interests of the Debtors' unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

5. SSCP is a multi-brand restaurant owner, operator and real estate company with over 400 brand locations across the country. SSCP is the parent company of Cicis Pizza (over 300 locations) and the fine dining concept Roy's (four locations). SSCP's restaurant brands also include 80 Applebee's locations and 43 Sonic Drive-In locations. On information and belief,

SSCP is not a bank, institutional lender, or any other type of business whose primary business activities include advancing loans and obtaining repayment on those loans.

## JURISDICTION AND VENUE

6. This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (K) and (O). The Committee consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8. Venue is proper in this judicial district under 28 U.S.C. § 1409(a).

9. The statutory predicates for the relief requested herein are, *inter alia*, sections 105(a), 502(a), 502(b) and 510(c) of the Bankruptcy Code, Rule 3007 of the Federal Rules of Bankruptcy Procedure, and 28 U.S.C. § 2201.

## BACKGROUND FACTS

**A.     SSCP's Acquisition of the Debt**

10. SSCP is a market competitor of the Debtors, owning and operating hundreds of locations of four different restaurant brands, including concepts very similar, and seemingly complementary, to the Corner Bakery concept. SSCP is neither a bank nor a traditional lender, and its primary business does not involve the issuance of loans for repayment.

11. SSCP was not the original lender to the Debtors. Rather, SSCP acquired the debt in early 2023 from a lending group led by Goldman Sachs Specialty Lending Group, L.P. ("Goldman Sachs"), as Administrative Agent and Collateral Agent. SSCP acquired the debt for a purchase price of $▮▮▮▮▮▮▮ (the "Purchase Price"), which represents a significant

discount on the alleged outstanding balance of the debt at the time it was acquired by SSCP. SSCP filed a proof of claim in the Chapter 11 Cases in which it asserts a secured in the amount of $42,326,283.97 (plus additional accruals) on April 6, 2023. *See* Case No. 23-10245 (KBO), Claim No. 55 (the "SSCP Proof of Claim").

12.     Almost immediately after acquiring the debt, SSCP moved quickly to foreclosure in order to obtain control over the Debtors' assets. On the eve of foreclosure, the Debtors filed their respective voluntary petitions that stayed the foreclosure by SSCP and commenced these Chapter 11 Cases.

13.     SSCP's motivation has been clear since the moment it acquired the debt: to obtain control of the Debtors' assets in order to add another restaurant brand to its expanding portfolio. SSCP's historical dealings include obtaining another business through a distressed note acquisition followed by a credit bid in a subsequent bankruptcy process – its relatively recent acquisition of Cicis Pizza is such an example. While SSCP might suggest, from time to time, that it would be perfectly fine obtaining repayment of the debt it claims it is owed, actions speak louder than words, and SSCP's actions point straight to a clear and unequivocal intent to obtain control of the Debtors' assets for a credit bid and not to accepting repayment of the debt. Indeed, SSCP is, after all, a restaurant owner and operator and is not in the business of extending loans as a financial accommodation for repayment.

14.     SSCP's motivation manifested clearly through its quick move to foreclose shortly after acquiring the debt that it knew was already distressed, and has been made even more obvious through SSCP's consistent actions since the Petition Date in these Chapter 11 Cases, including, but not limited to:

- by exerting undue control over the Debtors and their administration of the Chapter 11 Cases far beyond what a typical lender seeking to monitor its collateral would do;

- by injecting itself into the development of bid procedures—and the sale process generally—for the sale of substantially all of the Debtors assets, and in seeking Court approval thereof, far beyond what a typical lender seeking to monitor its collateral would do;

- by refusing to accept the Debtors' request for a toggle that would allow the Debtors to switch from a sale process to a plan process in the event that, within a specified period of time, the Debtors are able to raise committed exit financing sufficient to repay SSCP in full; and

- by taking frequent steps that are intended to chill bidding for the Debtors' assets so that SSCP is left standing as the only potential acquiror of the Debtors' assets.

15.     SSCP has made clear since the Petition Date—both early and often—that it intends to seek to acquire the Debtors' assets through a credit bid of the debt that it acquired at a steep discount rather than simply obtaining repayment of the debt.

**B.     The Loan Documents**

16.     The debt underlying the SSCP Proof of Claim arises under: (i) a Credit and Guaranty Agreement dated as of November 10, 2017 (the "<u>Credit Agreement</u>") by and among Debtors CBC Restaurant Corp., Corner Bakery Holding Company f/k/a IFCB Holding Corporation, and certain subsidiaries of CBC Restaurant Corp., as Guarantors (collectively, the "<u>Credit Parties</u>"), the Lenders party thereto from time to time, and Goldman Sachs, as Administrative Agent and Collateral Agent; and (ii) a Pledge and Security Agreement dated November 10, 2017 by and among Goldman Sachs, as Collateral Agent, and the Guarantors

party thereto, including the Credit Parties.  The Credit Agreement was amended or modified nine times through various documented loan amendments.

**C.      The Void Reinstatement Fee**

17.      The SSCP Proof of Claim includes, as a component of the claim, a $5,519,595.26 line item representing an alleged "Reinstated Amount" (the "Reinstated Amount").

18.      The source of the Reinstated Amount that SSCP included as part of its claim is found exclusively in the Consent and Eighth Amendment to Credit and Guaranty Agreement dated October 28, 2020 (the "Eighth Amendment"), which provides as follows in Section 6(b):

> If Event of Default occurs under Section 8.1(f) or (g) of the Credit Agreement, a portion of the Forgiven Amount equal to the Reinstated Amount (as hereafter defined) shall immediately be reinstated, without need for any action by any Person, and shall be enforceable against the Credit Parties and their successors and assigns as if such amount had never been forgiven. "Reinstated Amount" means, as of the date of the occurrence of any event described in the foregoing clauses (i) or (ii) of this Section 6(b), an amount equal to fifteen percent (15%) of the outstanding principal amount of the Tranche A Term Loans as of such date.

*See* SSCP Proof of Claim, at Ex. 9, p. 4.

19.      Sections 8.1(f) and (g) of the Credit Agreement provide as follows:

> **8.1      Events of Default**
>
> If any one or more of the following conditions or events shall occur:
>
> $* * *$
>
> (f) <u>Involuntary Bankruptcy; Appointment of Receiver, etc.</u> (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Holdings or any of its Subsidiaries under the Bankruptcy Code or under any

other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty consecutive days without having been dismissed, bonded or discharged; or

(g) <u>Voluntary Bankruptcy; Appointment of Receiver, etc</u>. (i) Holdings or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body)of Holdings or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1 (f)[.]

*See* SSCP Proof of Claim, at Ex. 1, pp. 128-9.

20.     Therefore, the Events of Default referenced in Section 6(b) of the Eighth Amendment are all bankruptcy-based or similar events.  The only such event that conceivably applies here upon which SSCP based its inclusion of the Reinstated Amount is the voluntary bankruptcy filing by the Debtors as no other events under either Section 8.1(f) or (g) of the Credit Agreement have occurred.  Accordingly, SSCP has included the Reinstated Amount in the SSCP Proof of Claim solely based upon the Debtors' voluntary bankruptcy filing.

21.     The basis for SSCP's inclusion of the Reinstated Amount in the SSCP Proof of Claim is an *ipso facto* clause that is void as a matter of law. As such, the SSCP Proof of Claim must be reduced by the amount of the Reinstated Amount.

22.     Even if the Reinstated Amount is properly claimed—which it is not—SSCP has miscalculated the Reinstated Amount: as the outstanding principal amount of the Tranche A Term Loans as of the Petition Date was $35,000,000, the correct calculation of the Reinstated Amount under the formula set forth in Section 6(b) of the Eighth Amendment is $5,250,000. At a minimum, the Reinstated Amount must be reduced to this figure.

**D.      SSCP Is Not an "Eligible Assignee" of the Debt**

23.     The Credit Agreement limits who can be an assignee of the underlying debt. Under Section 10.6(c) of the Credit Agreement, no assignment of any portion of the debt may occur except to an "Eligible Assignee." The Credit Agreement defines Eligible Assignee as follows in Section 1.1:

> **"Eligible Assignee"** means (i) in the case of Revolving Loans or Revolving Companies, (a) any Lender with Revolving Exposure or any Affiliate (other than a natural person) of a Lender with Revolving Exposure, (b) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets or net worth in excess of $100,000,000, (c) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets or net worth in excess of $100,000,000, provided that such bank is acting through a branch or agency located in the United States, and (d) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets or net worth in excess of $100,000,000, (ii) in the case of the Term Loans, (a) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (b) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as

defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses, and (iii) any other Person (other than a natural Person)approved by Administrative Agent and, so long as no Specified Event of Default has occurred and is continuing, Company (with Company's approval not to be unreasonably withheld, conditioned or delayed, and Company deemed to have approved any such other Person to the extent Company does not disapprove of such Person in writing within ten (10) Business Days following a written request to Company to approve such Person); provided, (x) neither (A) Holdings nor any Affiliate of Holdings nor (B)the Sponsor nor any Affiliate of the Sponsor shall, in any event, be an Eligible Assignee, (y) no Person owning or controlling any trade debt or Indebtedness of any Credit Party or Subsidiary other than the Obligations or any Capital Stock of any Credit Party or Subsidiary (in each case, unless approved by the Administrative Agent)shall, in any event, be an Eligible Assignee, and (z) in no event shall a Disqualified Lender constitute an Eligible Assignee absent the prior written consent of Company (which may be withheld in Company's sole discretion).

*See* SSCP Proof of Claim, at Ex. 1, pp. 18-19.

24. The Credit Agreement further defines a "Disqualified Lender" as follows in Section 1.1:

> **"Disqualified Lender"** means any Person that is (i) a bona fide competitor of Company or any of its Subsidiaries operating in the same line of business as is conducted by Company or any of its Subsidiaries as of the Closing Date, and (ii) any Affiliates of any such competitor described in clause (i) above identified in writing from time to time by Company to Administrative Agent or that are reasonably identifiable as Affiliates of Persons described in clause (i) above on the basis of their name (excluding for all purposes, in the case of this clause (ii), any bona fide debt fund affiliates of any such competitor described in clause (i) or Affiliates thereof otherwise described in this clause (ii)).

*See* SSCP Proof of Claim, at Ex. 1, p. 18.

25. As a bona fide competitor of the Debtors, SSCP would constitute a Disqualified Lender. However, the Disqualified Lender concept was stricken from the Credit Agreement by the Eighth Amendment.

26.     Nevertheless, SSCP is not an Eligible Assignee of the debt.  Closely examining the definition of "Eligible Assignee:"

- Subpart (i) is a very specific limitation on who can be an Eligible Assignee, consisting of financial institutions and more traditional lenders, which SSCP is not;

- Subpart (ii) is also a very specific limitation on who can be an Eligible Assignee, including only (a) affiliates of an existing lender, which SSCP is not, and (b) accredited investors that extend credit or buy loans as one of its businesses, which SSCP does not; and

- Subpart (iii) is a broad, extremely general catch-all that includes any other entity approved by Administrative Agent.

*See* SSCP Proof of Claim, at Ex. 1, pp. 18-19.

27.     The general catch-all provision found in subpart (iii) of the definition of "Eligible Assignee" effectively moots and renders meaningless subparts (i) and (ii) of the definition of "Eligible Assignee" because the Administrative Agent can simply approve whomever it wishes and that entity will be deemed an Eligible Assignee under subpart (iii), even if that entity would not otherwise qualify as an Eligible Assignee under subparts (i) and (ii).

28.     Under generally-held principles of contract construction, general catch-all provisions that moot and render meaningless more specific provisions of a contract shall be stricken and read out of the agreement.  In this case, that is exactly what subpart (iii) of the definition of "Eligible Assignee" does.  As such, subpart (iii) of the definition of "Eligible Assignee" must be stricken from the Credit Agreement because its existence would render subparts (i) and (ii) meaningless.  Accordingly, SSCP is not an Eligible Assignee, does not properly hold the debt that evidences the SSCP Proof of Claim, and SSCP is not entitled to any of the rights and privileges appurtenant to being a holder of the debt, including, but not limited to, the right to receive any distributions on account of its alleged secured claim and the right to credit bid for the Debtors' assets.

**E.** **SSCP's Excessive Control Over the Debtors, Their Conduct of These Chapter 11 Cases and the Sale Process**

29.     Since the Petition Date, SSCP has engaged in a focused effort to exercise undue control over the Debtors, the conduct of the Debtors' Chapter 11 Cases, and the Debtors' conduct of a sale process, well beyond what would be expected of a typical secured lender seeking to monitor its collateral, all with the clear and unequivocal intent, as demonstrated by SSCP's consistent actions, to obtain control of the Debtors' assets for a credit bid.

30.     Examples of SSCP's actions to exercise control over the Debtors, the Debtors' conduct of their Chapter 11 Cases, and the Debtors' conduct of a sale process include, but are not limited to, the following:

(a)     Requiring the appointment of a Chief Restructuring Officer ("CRO") as a condition to SSCP's consent to use its cash collateral and SSCP's willingness to extend debtor in possession financing;

(b)     Rejecting the Debtors' choice of CRO – an individual who presents significant restaurant operational experience and who the Debtors, on information and belief, in the exercise of their business judgment, believed was the best choice for CRO under the circumstances;

(c)     Insisting upon the engagement of one specific firm – CR3 Partners – to act as CRO, notwithstanding the Debtors' expressed preference for a different CRO;

(d)     Insisting upon and having full access—as of March 7, 2023—to the Debtors' Rosnet system, which is the Debtors' point-of-sale system, giving SSCP full, direct and real-time visibility into detailed point-of-sale information;

(e)     Having in the possession of its financial advisor, and for its own use, a laptop that, on information and belief, provides full, direct and real-time access to all of the Debtors' financial systems and information (separate from, and in addition to, SSCP's access to the Rosnet system) which was in the possession of Goldman Sachs' financial advisor prior to the debt being sold to SSCP and which has remained in the possession of that same financial advisor, now acting on behalf of SSCP, since SSCP acquired the debt;

(f)     Making repeated, excessive and onerous information and document requests that constantly diverted the Debtors' resources and distracted the Debtors and their professionals from conducting the Chapter 11 Cases, including, but not limited to, the following:

     i.     During negotiations regarding an interim cash collateral order, SSCP demanded the following:

- P/L for Borrower and Guarantors for past 36 months (by month)
- Balance Sheets for Borrower/Guarantor for past 36 months (by month)
- Statement of Cash Flows from Borrower/Guarantors for last 36 months (by month)
- Tax Returns (Borrower & Guarantor) 2020 and 2021
- Audited Financial Statements for 2020 and 2021
- Copies of all bank statements for last 36 month (by month)
- Same Store Sales for past 36 months (by month)

    ii.     On March 6, 2023, SSCP requested that the Debtors prepare and supply to SSCP "a spreadsheet listing store location and amounts (including HQ and Rohan) of (a) payroll paid to date and (b) how much in outstanding (uncashed) payroll checks;"

iii.    On March 7, 2023, SSCP demanded significantly expanded access to the Rosnet system by e-mailing the Debtors as follows: "The only reports available are sales reports, I need read only access to all data including food costs and all financial P&L data by store for past 2 years."

iv.    Again on March 7, 2023, SSCP clarified its demand for significantly expanded access to the Rosnet system by e-mailing the Debtors as follows: "The report I have access to currently are scant. I need more than the mere sales report, I need food, labor etc. all expenses, we need to run P&L for every location for last 24 months and same store sales. Below is a preliminary list of reports that we need access.

- Daily Sales Report
- Daily Summary Report
- Purchase History Report
- Comparative Sales Covers & PPA Report
- Day Part Comparison Report
- Sales Tax Category Report
- Daily Deposit Report
- Credit Card Summary Report
- 52-week Report (2 years capability)
- Job Category Comparison Report
- Job Category Summary Report
- Schedule to Actual Report
- Sales & Cash Summary Report
- Inventory Summary Report
- Product Mix Report
- A v T Summary Report
- Sales/Labor Summary Report
- Hourly Sales Statistics Report
- Comparative Product Mix Report"

v.     On March 14, 2023, SSCP demanded significant additional information by e-mailing the Debtors as follows: "Please provide the additional financial information as well:

- Report showing cash disbursements from the close of the 2020 transaction to bankruptcy filing in excel (i.e, payment register or cash disbursement journal)
- Full cash account general ledgers in excel from the close of the 2020 transaction to bankruptcy filing (more current if possible)
- Monthly trial balance data by unit/entity from October 2020 thru February 2023 (months in the columns across the top and accounts going down the rows)
- Spreadsheet with G&A expenses (including any shared management services from affiliates) since 2020 transaction (annual) through March 10 (YTD)."

vi.     SSCP included significant other excessive and onerous document and information requirements in the various cash collateral and senior debtor in possession financing orders entered in the Chapter 11 Cases;

(g)     On April 22, 2023, sending an e-mail to the Debtors insisting that the Debtors immediately pursue an action to recover significant prepetition payments made to the Debtors' management company, during a time when the Debtors and their professionals were focusing their efforts on the sale process in order to maximize value for creditors, and where there remained a long horizon on the statute of limitations for such a recovery action (and further, demanding a grant of derivative standing to immediately prosecute such actions if the Debtors declined to do so);

(h)     Repeatedly declining the Debtors' request for funding to install an independent director which, on information and belief, in the Debtors'

business judgment, was both reasonable and necessary under the circumstances;

(i) Refusing to accept a toggle in the bankruptcy process that would allow the Debtors to switch from a sale process to a plan process in the event that, within a specified period of time, the Debtors are able to raise committed exit financing sufficient to repay SSCP in full;

(j) Refusing to fund debtor in possession financing absent an across-the-board decrease on budgeted estate professional fees;

(k) Requiring SSCP's consent as a condition to the Debtors closing any store locations (not just to reject leases);

(l) Refusing to consent to the Debtors closing over two dozen store locations that had negative EBITDA in the aggregate annual amount of nearly $3.5 million in 2022, which continue to maintain negative cash flow, and which store locations have drained critical and limited resources from the Debtors' estates that have been needed during the Chapter 11 Cases;

(m) Establishing a DIP milestone that required the Debtors to file a bid procedures motion that was satisfactory to SSCP (without a reasonableness qualifier);

(n) Repeatedly threatening to call defaults for alleged violations by the Debtors of covenants under the senior debtor in possession financing order as a means to extract information that SSCP wanted and other concessions, when in fact, such violations had not actually occurred;

(o)     SSCP's counsel controlling the proposed bid procedures order and corresponding bid procedures, including leading (rather than Debtors' counsel) discussions and negotiations regarding the bid procedures and order with other parties-in-interest, and SSCP's counsel (not Debtors' counsel) sharing his screen and walking the Court through the bid procedures (not Debtors' counsel) during the conduct of the bid procedures hearing;

(p)     Insisting upon receiving detailed information regarding bidders for the Debtors' assets, including actual copies of all nondisclosure agreements signed by interested parties;

(q)     Refraining from acting as the stalking horse bidder in order to remain as a Consultation Party under the bid procedures, thus enabling SSCP to consult regarding who is a Qualified Bidder, even though SSCP fully intended to submit a bid;

(r)     Demanding on May 16, 2023 that the Debtors cancel the auction for their assets, despite the existence of credible third-party interest in a cash transaction, and immediately pivot to a private sale to SSCP for no cash consideration (only credit dollars); and

(s)     After the commencement of the marketing process for the sale of the Debtors' assets, SSCP personnel directly contacting the Debtors' corporate office personnel at a time when SSCP was vacillating between submitting a stalking horse bid or not and without having signed a

nondisclosure agreement as required in the sale process in these Chapter 11 Cases for all interested bidders.

31.     As evidenced by the examples listed above, SSCP has exercised undue control, beyond that of a typical lender, and has usurped the Debtors' business judgment by, for example, precluding the Debtors from closing any store locations – not just rejecting leases – without SSCP's consent.  Over two dozen locations that had negative EBITDA in the aggregate amount of nearly $3.5 million in 2022 and which continue to post negative cash flow since the Petition Date have remained open because SSCP refused to consent to the closure of those underperforming locations.  SSCP put this control in place because it intends to purchase the Debtors' assets with a credit bid, and SSCP wants even the cash flow negative locations to remain open because SSCP believes that it can run those locations better than current management.  In the meantime, having cash flow negative locations open depresses enterprise value—the negative EBITDA locations decrease 2022 enterprise EBITDA by nearly one-third— and chills bidding, which further supports SSCP's intent to obtain control over the Debtors' assets through a credit bid.

32.     SSCP's undue control over the Debtors, throughout the Chapter 11 Cases, and their conduct of a sale process, well beyond what would be expected of a typical secured lender seeking to monitor its collateral, has had a deleterious effect on these Chapter 11 Cases and the Debtors' ability to maximize value for all stakeholders.  SSCP's actions should not be countenanced; rather, based upon its egregious conduct, SSCP's claim should be equitably subordinated in its entirety.

## COUNT I
## Disallowance of the Reinstated Amount

33.     The Committee repeats and realleges the allegations contained in paragraphs 1 through 32 of the Complaint as if fully set forth herein.

34.     The Reinstated Amount is based solely upon Section 6(b) of the Eighth Amendment which, in turn, causes the imposition of the Reinstated Amount only upon the occurrence of events described in Sections 8.1(f) or (g) of the Credit Agreement.

35.     The event upon which SSCP bases its inclusion of the Reinstated Amount in the SSCP Proof of Claim is the Debtors' bankruptcy filing.

36.     SSCP's imposition of the Reinstated Amount is therefore based solely upon a void *ipso facto* clause.

37.     Under 11 U.S.C. § 502(b)(1), the Reinstated Amount must be disallowed because it is unenforceable against the Debtors under applicable law.

38.     Alternatively, even if the Reinstated Amount is not disallowed, because SSCP miscalculated and overstated this amount, it must be reduced to the correct amount of $5,250,000.

**WHEREFORE,** the Committee respectfully requests that this Court enter judgment in its favor and against SSCP:

(a)     disallowing the Reinstated Amount;

(b)     in the alternative, reducing the Reinstated Amount to $5,250,000; and

(c)     granting such other and further relief in favor of the Committee as this Court deems fair and equitable.

**COUNT II**
**Declaratory Judgment That SSCP Is Not an "Eligible Assignee" of the Debt**

39.     The Committee repeats and realleges the allegations contained in paragraphs 1 through 32 of the Complaint as if fully set forth herein.

40.     An actual controversy exists between the parties regarding SSCP's eligibility to be the holder of the debt underlying the SSCP Proof of Claim.

41.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

42.     A declaratory judgment would settle this controversy between the parties and would clarify the parties' current legal rights, duties and obligations.

43.     The general catch-all provision found in Section 10.6(c) of the Credit Agreement at subpart (iii) of the definition of "Eligible Assignee" effectively moots and renders meaningless subparts (i) and (ii) of the definition of "Eligible Assignee" because the Administrative Agent can simply approve whomever it wishes and that entity will be deemed an Eligible Assignee under subpart (iii), even if that entity would not otherwise qualify as an Eligible Assignee under subparts (i) and (ii).

44.     Under generally-held principles of contract construction, where a general catch-all provision that moots and renders meaningless more specific provisions of a contract, the specific provision shall control.

45.     Based upon those principles, subparts (i) and (ii) of Section 10.6(c) of the Credit Agreement control over subpart (iii) which must be ignored.

46.     Accordingly, this Court should declare that SSCP is not an Eligible Assignee, does not properly hold the debt that evidences the SSCP Proof of Claim, and that SSCP is not entitled to any of the rights and privileges appurtenant to being a holder of the debt, including,

but not limited to, the right to receive any distributions on account of its alleged secured claim and the right to credit bid for the Debtors' assets.

**WHEREFORE,** the Committee respectfully requests that this Court enter judgment in its favor and against SSCP:

    (a)    declaring that:

        (i)    SSCP is not an Eligible Assignee;

        (ii)    SSCP does not properly hold the debt that evidences the SSCP Proof of Claim;

        (iii)    SSCP shall not be entitled to receive any distributions on account of its alleged secured claim; and

        (iv)    SSCP shall not be entitled to credit bid for the Debtors' assets.

    (b)    granting such other and further relief in favor of the Committee as this Court deems fair and equitable.

## COUNT III
### Disallowance of SSCP's Entire Secured Claim Because It Is Not an "Eligible Assignee"

47.    The Committee repeats and realleges the allegations contained in paragraphs 1 through 32 of the Complaint as if fully set forth herein.

48.    SSCP is not an Eligible Assignee of the debt underlying the SSCP Proof of Claim.

49.    Because SSCP is not an Eligible Assignee, it does not properly hold the debt that underlies the SSCP Proof of Claim.

50.    Because it is not an Eligible Assignee, SSCP is not owed any amount by the Debtors and is not entitled to assert any claim based upon the Credit Agreement against the Debtors.

51.     Under 11 U.S.C. § 502(b)(1), the SSCP Proof of Claim must be disallowed because it is unenforceable against the Debtors under both the Credit Agreement and under applicable law.

**WHEREFORE,** the Committee respectfully requests that this Court enter judgment in its favor and against SSCP:

(a)     disallowing the SSCP Proof of Claim in its entirety; and

(b)     granting such other and further relief in favor of the Committee as this Court deems fair and equitable.

### COUNT IV
### Equitable Subordination of SSCP's Entire Secured Claim Under 11 U.S.C. § 510(c)

52.     The Committee repeats and realleges the allegations contained in paragraphs 1 through 32 of the Complaint as if fully set forth herein.

53.     Section 510(c) of the Bankruptcy Code states that the Court may: "(1) under principals of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).

54.     Courts analyzing requests for equitable subordination have generally adopted the following three-part test, each of the conditions of which must be satisfied in order for a claim to be equitably subordinated:  "(i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]." *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

55.     The test for equitable subordination is not static and allows for subordination in any situation when "equity demands that the payment priority of claims... be changed...."  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006).

56.     In addition, Third Circuit precedent holds that inequitable conduct is not a necessary requirement for equitable subordination.  *Burden v. United States*, 917 F.2d 115, 120 (3d Cir. 1990).

57.     Each of the elements of the *Mobile Steel* test is met, such that equitable subordination of the SSCP Proof of Claim to the claims of general unsecured creditors is appropriate pursuant to section 510(c) of the Bankruptcy Code.

58.     First, SSCP engaged in substantial inequitable conduct since the Petition Date (and even prior to the Petition Date) by exercising undue control over the Debtors, the Debtors' administration of the Chapter 11 Cases, and the Debtors' conduct of a sale process, well beyond what would be expected of a typical secured lender seeking to monitor its collateral, all with the clear and unequivocal intent, as demonstrated by SSCP's consistent actions, to obtain control of the Debtors' assets for a credit bid.  SSCP's inequitable conduct is evidenced by, among other actions, the following:

> (a)     Requiring the appointment of a CRO as a condition to SSCP's consent to use its cash collateral and SSCP's willingness to extend debtor in possession financing;

> (b)     Rejecting the Debtors' choice of CRO – an individual who presents significant restaurant operational experience and who the Debtors, on information and belief, in the exercise of their business judgment, believed was the best choice for CRO under the circumstances;

(c)     Insisting upon the engagement of one specific firm—CR3 Partners—to act as CRO, notwithstanding the Debtors' expressed preference for a different CRO;

(d)     Insisting upon and having full access—as of March 7, 2023—to the Debtors' Rosnet system, which is the Debtors' point-of-sale system, giving SSCP full, direct and real-time visibility into detailed point-of-sale information;

(e)     Having in the possession of its financial advisor, and for its own use, a laptop that, on information and belief, provides full, direct and real-time access to all of the Debtors' financial systems and information (separate from, and in addition to, SSCP's access to the Rosnet system) which was in the possession of Goldman Sachs' financial advisor prior to the debt being sold to SSCP and which has remained in the possession of that same financial advisor, now acting on behalf of SSCP, since SSCP acquired the debt;

(f)     Making repeated, excessive and onerous information and document requests that constantly diverted the Debtors' resources and distracted the Debtors and their professionals from conducting the Chapter 11 Cases;

(g)     Sending an e-mail to the Debtors on April 22, 2023 insisting that the Debtors immediately pursue an action to recover significant prepetition payments made to the Debtors' management company, during a time when the Debtors and their professionals were focusing their efforts on the sale process in order to maximize value for creditors, and where there

remained a long horizon on the statute of limitations for such a recovery action, and demanding that the Debtors consent to SSCP having derivative standing to pursue the same if the Debtors refused to pursue these claims, where pursuing claims against the Debtors' management company would have the likely effect of causing the Debtors' management company to cease providing services to the Debtors during the critical sale process which would significantly chill bidding and leave SSCP as the only bidder standing;

(h)     Repeatedly declining the Debtors' request for funding to install an independent director which, on information and belief, in the Debtors' business judgment, was both reasonable and necessary under the circumstances;

(i)     Refusing to accept a toggle in the bankruptcy process that would allow the Debtors to switch from a sale process to a plan process in the event that, within a specified period of time, the Debtors are able to raise committed exit financing sufficient to repay SSCP in full;

(j)     Refusing to fund debtor in possession financing absent an across-the-board decrease on budgeted estate professional fees;

(k)     Requiring SSCP's consent as a condition to the Debtors closing any store locations (not just to reject leases);

(l)     Refusing to consent to the Debtors closing over two dozen store locations that had negative EBITDA in the aggregate annual amount of nearly $3.5

million in 2022, which continue to maintain negative cash flow, and which store locations remaining open

- has drained critical and limited resources from the Debtors' estates that have been needed during the Chapter 11 Cases; and

- has depressed enterprise value of the Debtors' business—the negative EBITDA locations decrease 2022 enterprise EBITDA by nearly one-third—which chills bidding and gives SSCP, as a party intent on obtaining control over the Debtors' assets through a credit bid, an unfair advantage;

(m)     Establishing a DIP milestone that required the Debtors to file a bid procedures motion that was satisfactory to SSCP (without a reasonableness qualifier);

(n)     Repeatedly threatening to call defaults for alleged violations by the Debtors of covenants under the senior debtor in possession financing order as a means to extract information that SSCP wanted and other concessions, when in fact, such violations had not actually occurred;

(o)     SSCP's counsel controlling the proposed bid procedures order and corresponding bid procedures, including leading (rather than Debtors' counsel) discussions and negotiations regarding the bid procedures and order with other parties-in-interest, and SSCP's counsel (not Debtors' counsel) sharing his screen and walking the Court through the bid procedures (not Debtors' counsel) during the conduct of the bid procedures hearing;

(p)     Insisting upon receiving detailed information regarding bidders for the Debtors' assets, including actual copies of all nondisclosure agreements signed by interested parties;

(q)     Refraining from acting as the stalking horse bidder in order to remain as a Consultation Party under the bid procedures, thus enabling SSCP to consult regarding who is a Qualified Bidder, even though SSCP fully intended to submit a bid;

(r)     Demanding on May 16, 2023 that the Debtors cancel the auction for their assets, despite the existence of credible third-party interest in a cash transaction, and immediately pivot to a private sale to SSCP for no cash consideration (only credit dollars); and

(s)     On information and belief, after the commencement of the marketing process for the sale of the Debtors' assets, SSCP personnel directly contacting the Debtors' corporate office personnel at a time when SSCP was vascillating between submitting a stalking horse bid or not and without having signed a nondisclosure agreement as required in the sale process in these Chapter 11 Cases for all interested bidders.

59.     The inequitable conduct of SSCP conferred a significant unfair advantage on SSCP and caused substantial harm to the Debtors' estates and legitimate unsecured creditors. For example:

- SSCP's constant onerous demands for excessive information from the Debtors significantly diverted resources and distracted the Debtors and their professionals from the conduct of their Chapter 11 Cases, where permitting the Debtors to focus their attention on the critical task of running their Chapter 11 Cases and the sale process would maximize value for all stakeholders;

- SSCP's refusal to permit a toggle to a plan process significantly increased the likelihood that SSCP would be able to obtain the Debtors' assets through a credit bid in a sale process and deprived creditors of the opportunity for increased value and recoveries by unilaterally foreclosing the option of a plan process;

- SSCP's veto of the Debtors' preferred choice for CRO, an experienced restaurant operator;

- By insisting that cash flow negative stores remain open and refusing to consent to the Debtors' proposed closure of those locations, SSCP caused enterprise value to be depressed which, in turn, chills bidding and decreases the value to be obtained in a going concern sale of substantially all of the Debtors' assets;

- Having full and direct access to the Debtors' Rosnet point-of-sale system and, separately and in addition, to the Debtors' full financial systems goes well beyond what a typical secured lender would receive, and even goes beyond the information access granted to SSCP under the Credit Agreement, including its various amendments, and afforded SSCP an unfair advantage, particularly as to other bidders who do not have access to such detailed information in connection with the sale process;

- SSCP held the entire estate hostage at a time when the Debtors needed debtor in possession financing, which SSCP was willing to provide, but only if significant cuts were made to budgeted professional fees, because SSCP did not want to "pay the freight" for the Chapter 11 Cases in which SSCP sought to obtain control of the Debtors' assets for a credit bid, and which would make it significantly more difficult for the Debtors to run the Chapter 11 Cases in a manner that would maximize value for all stakeholders;

- SSCP's insistence that it remain as a Consultation Party in connection with the sale process prior to submitting a bid had the effect of allowing SSCP,[2] as a party whose sole motivation is to obtain control of the Debtors' assets through a credit bid, to have input into the determination as to whether other bidders constitute a Qualified Bidder, in effect allowing SSCP a significant role in keeping the competition out of the bidding process;

- SSCP's counsel having control over the bid procedures and related order, including during the bid procedures hearing, which is a highly unusual

---

[2] While the Committee acknowledges that the parties ultimately agreed to this provision in the bid procedures order, both the Debtors and the Committee had no choice but to agree: SSCP had unilateral consent rights with respect to the bid procedures under the terms of the Interim DIP Order and the entry of a bid procedures order that was not acceptable to SSCP would have had the draconian result of triggering a DIP default.

exercise of control over a document and procedures that normally would be handled by the debtor; and

- SSCP personnel directly contacting corporate office personnel of the Debtors, while not having submitted a bid or having signed a nondisclosure agreement, intentionally interfered with the sale process and the Debtors' ability to maximize value as the Debtors' employees who were contacted might feel betrothed to SSCP and, thus, unwilling to work for any other buyer who might win the auction.

60.    In light of the foregoing circumstances, equitable subordination of the SSCP Proof of Claim will do justice to the Debtors' legitimate unsecured creditors, and is consistent with the provisions of the Bankruptcy Code.

**WHEREFORE,** the Committee respectfully requests that this Court enter judgment in its favor and against SSCP:

(a)    equitably subordinating the SSCP Proof of Claim to the legitimate claims of all general unsecured creditors; and

(b)    granting such other and further relief in favor of the Committee as this Court deems fair and equitable.

*[Remainder of Page Intentionally Left Blank]*

Dated:  May 19, 2023
        Wilmington, Delaware

Respectfully submitted,

*/s/ Aaron H. Stulman*
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
Levi Akkerman (No. 7015)
**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone:      (302) 984-6000
Facsimile:      (302) 658-1192
Email:   csamis@potteranderson.com
       astulman@potteranderson.com
       lakkerman@potteranderson.com

- and -

Jason M. Torf, Esq.
Thomas R. Fawkes, Esq.
Brian J. Jackiw, Esq.
**TUCKER ELLIS LLP**
233 S. Wacker Dr., Suite 6950
Chicago, Illinois 60606
Telephone:      (312) 624-6300
Facsimile:      (312) 624-6309
Email:   jason.torf@tuckerellis.com
       thomas.fawkes@tuckerellis.com
       brian.jackiw@tuckerellis.com

*Co-Counsel for the Official Committee of Unsecured Creditors*

IMPAC - 10823105v.2  05/19/2023 9:48 PM